IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 10, 2022 Session

### STATE OF TENNESSEE v. MICHAEL MIMMS

**Appeal from the Circuit Court for Montgomery County**
**No. CC2017-CR-1065      William R. Goodman, III, Judge**

_____

### No. M2021-00383-CCA-R3-CD

_____

In 2020, a Montgomery County jury convicted the Defendant, Michael Mimms, of facilitation of first degree premeditated murder and conspiracy to commit first degree premeditated murder. The trial court imposed concurrent fifteen-year sentences in confinement. On appeal, the Defendant contends that the evidence is insufficient to support his convictions. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which ROBERT L. HOLLOWAY, JR., and JOHN W. CAMPBELL, SR., JJ., joined.

Crystal L. Myers, Assistant District Public Defender, Clarksville, Tennessee (at trial); and Kendall Stivers Jones, Assistant District Public Defender – Appellate Division, Franklin, Tennessee (on appeal), for the appellant, Michael Mimms.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Robert J. Nash, District Attorney General; and J. Lee Willoughby, Kaila S. Browning, and R. Alan Thompson, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION
### I. Background

This case arises from the shooting death of the victim, Antonio Henson, in Clarksville, Tennessee on January 21, 2017. The shooting was in retaliation for the victim failing to pay for drugs that he purchased from a group, which included the Defendant and his cousins, Tavarius Goliday and Kevonte White. Based on this incident, a Montgomery County grand jury indicted the Defendant, Mr. Goliday and Mr. White for first degree

premeditated murder and conspiracy to commit first degree premeditated murder. The Defendant was tried jointly with his co-defendant Goliday; however, their cases were severed on appeal. Mr. White testified at their trial.

## II. Trial

The following evidence was presented at the trial of the Defendant and Mr. Goliday: Joel Gibbons testified that he was employed by the Clarksville Police Department ("CPD") and responded to the scene of a reported shooting on January 21, 2017, on Kellogg Street in Clarksville, Tennessee ("Kellogg Street residence"). He observed a large crowd of approximately fifty people along with two law enforcement officers rendering aid to the victim. He knew the victim by his nickname, "Tinka."

Miguel Laboy testified that he was the medical examiner at Regional Forensic Center in Clarksville, Tennessee, and was admitted as an expert in forensic medicine. He performed an autopsy on the victim's body and identified a gunshot wound to the victim's back and another one to his left arm. He stated that both wounds caused the victim's death. From the victim's body, Dr. Laboy recovered two bullets which he turned over to the CPD. Both bullets were later determined to have been fired from a .22 caliber long rifle weapon.

CPD Officer Frederick McClintock testified that he was the lead detective in the investigation of the victim's death. During his investigation, Detective McClintock recovered the victim's phone and found text messages between the victim and Brice Moore and Davayon Head. The messages referred to purchasing drugs and evidenced a disagreement between the victim and the two men.

Detective McClintock stated that the shooting took place at the Kellogg Street residence, which he identified as a "known drug house," which was under video surveillance by law enforcement at the time of the victim's death. Surveillance video was also available from nearby businesses. Detective McClintock testified that the surveillance video captured the events surrounding the homicide. The State showed Detective McClintock still photographs of the surveillance video and clips of the video. He testified that the video showed the victim being shot on screen.

The video and photographs were published to the jury and showed the front of the Kellogg Street residence itself, the residence's front yard and driveway, and part of a dirt parking lot located to the side of the residence. A store was next door to the residence. Detective McClintock testified that there was also a video camera pointed at the back door of the residence from which the drugs were mostly sold. The victim appeared on the surveillance video, walking down the driveway. Soon after, a maroon Chevy Malibu, later identified as belonging to Dani Bell, co-defendant Goliday's girlfriend, drove by the residence, followed by a second vehicle, a white Lexus, later identified as belonging to Kristie Reynolds, Kevonte White's girlfriend. Detective McClintock identified Mr. White

2

in the video as the driver of the white Lexus. Detective McClintock also identified co-defendant Goliday in the video standing at the corner of the residence's lot. The video then showed the victim walking away from the residence and the Chevy Malibu following him.

Detective McClintock identified the Defendant in the surveillance video. In the video, the Defendant and co-defendant Goliday were seen speaking to each other on the street in front of the residence. Together, the Defendant and co-defendant Goliday walked away from the residence toward the adjacent parking lot and off the surveillance video's frame. Approximately a minute to one-and-a-half minutes later, the victim ran from the direction of the parking lot into the video's frame, following which he was shot in the back in front of the residence and fell to the ground on the video. The shooter was off camera. There were bystanders, later identified as the Merriweathers.

Turning back to his investigation of the victim's death, Detective McClintock stated that he obtained the victim's phone and, from the victim's text messages with Mr. Moore and Mr. Head, was able to determine that the victim had made a drug purchase from the two men and that they were in an argument about paying for the drugs and allowing the victim to continue selling drugs in the neighborhood. Detective McClintock eventually interviewed Mr. Head, who admitted to a "pill deal" with the victim that went awry and caused a disagreement between himself and the victim. Mr. Head identified Kevonte White as being involved in the deal, which led Detective McClintock to pursue Mr. White and his girlfriend, Ms. Reynolds, as part of his investigation.

Detective McClintock located Mr. White and Ms. Reynolds in a house in Bowling Green, Kentucky. There he also found the white Lexus shown in the Kellogg Street residence surveillance video. Detective McClintock arrested the couple on unrelated charges and, during separate interviews, Mr. White and Ms. Reynolds gave statements about the victim's murder. Detective McClintock learned from their statements that the murder weapon had been dumped in a pond on Ms. Reynolds's parent's property. A .22 caliber revolver was later recovered by law enforcement from the pond.

Based on their presence at the Kellogg Street residence as seen on the surveillance video, Detective McClintock interviewed the Defendant and co-defendant Goliday. The Defendant denied involvement in the victim's murder. Co-defendant Goliday initially denied any involvement, however, he eventually admitted to being in the area of the Kellogg Street residence, seeing the victim, being with the Defendant, being in his girlfriend's, Ms. Bell, Chevy Malibu, and driving past the victim. Co-defendant Goliday also admitted to using Ms. Bell's phone and vehicle that day. Detective McClintock seized Ms. Bell's car and CPD processed it for DNA, fingerprints, and other items of evidence.

On cross-examination, Detective McClintock testified that he believed co-defendant Goliday had the weapon and shot the victim. The Defendant, he believed, was present in Ms. Bell's vehicle in which the men were traveling to find the victim.

3

Dani Bell testified that she had been in a relationship with co-defendant Goliday and had been schoolmates with the Defendant. In January of 2017, Ms. Bell worked at a grocery store and typically allowed co-defendant Goliday to drive her vehicle, a maroon Chevy Malibu, while she was at work. Similarly, she allowed him to possess and use her phone. On January 21, 2017, Ms. Bell went to work from 10 a.m. to 4 p.m. She had given co-defendant Goliday her vehicle and phone that day. Co-defendant Goliday and the Defendant picked her up from work when her shift ended. She described the two men as best friends and "always together."

Shanice Merriweather testified that she was walking on Kellogg Street on the day of this incident and that a vehicle drove up to her group and started shooting. She testified that the vehicle was gray. She identified herself in the Kellogg Street residence surveillance video. She immediately called 911 after the shooting occurred. She identified the shooter in the surveillance video and the vehicle that she conceded was in fact white. She did not know if it was the same car that she saw with the shooter inside.

On cross-examination, Shanice Merriweather testified that the shooter was wearing a hat and had a hood pulled over the hat. She recognized the hat in the surveillance video as the hat worn by the shooter. She agreed that she had been shown photographic lineups and had not been able to identify the shooter.

Lucrettia Merriweather testified that she had known the victim since grade school and was present during the shooting on January 21, 2017. She stated that she and the victim were walking down the street when a car pulled up and shot the victim. She could only remember the hat that the shooter was wearing. She indicated that the shooter's vehicle was gray. She stated that she had been shown the surveillance video and had identified the shooter because of his hat.

On cross-examination, Lucrettia Merriweather agreed that she was uncertain whether the vehicle was gray and agreed that she told police officers that it was gray or light silver. She was shown a previous statement in which she stated that the shooter was wearing a gray hooded sweatshirt and did not mention a hat. She agreed that she had identified the shooter in a photographic lineup as someone else besides the Defendant or co-defendant Goliday.

Kevonte White testified that he was serving an eight-year sentence for robbery. He indicated that co-defendant Goliday was his cousin, and he identified him, Mr. Head, and the Defendant in the courtroom. Mr. White testified that he was in Clarksville on the day of the incident. He met up with co-defendant Goliday and Ms. Reynolds. The group drove around in Ms. Reynolds's white Lexus. At some point that day, Mr. White "became aware" that some pills had been stolen. The group met up with Mr. Head at a relative's house to "figure out what [was] going on." He testified that co-defendant Goliday was driving Ms.

4

Bell's car that day. The group determined that the victim, "Tinka," had stolen the pills and they decided to confront him. They spoke about shooting up the place where the victim was located.

Mr. White testified that as the group talked about going to find the victim, Ms. Reynolds talked Mr. White out of going along to find him. Co-defendant Goliday and the Defendant left to find the victim but Mr. White did not know where the men went. Fifteen or twenty minutes later, the two men called Mr. White on the phone to arrange to meet. When they met, co-defendant Goliday and the Defendant said that someone had shot the victim. They said that Mr. White's "little cousin" did it but Mr. White did not identify who his cousin was. Mr. White testified that he disposed of the gun used in the shooting by taking it to Ms. Reynolds's parents' house in Kentucky and throwing it in their pond. Mr. White said the weapon was a revolver that belonged to co-defendant Goliday.

On cross-examination, Mr. White confirmed he was with Ms. Reynolds and Mr. Head during the entire course of events on January 21, 2017. Mr. White agreed that co-defendant Goliday admitted to Mr. White that he shot the victim. Mr. White recalled being arrested in Kentucky with Ms. Reynolds after the shooting.

Kristie Reynolds testified that she met Mr. Head, co-defendant Goliday, and the Defendant through Mr. White. She identified them all in the courtroom. On January 20, 2017, Ms. Reynolds and Mr. White stayed at his relatives' home in Clarksville. Mr. White drove her white Lexus around Clarksville and they picked up Mr. Head from his mother's house to drive around and use drugs. A conversation took place between Mr. Head and Mr. White about missing money for pills that had been sold. The group met with co-defendant Goliday and the Defendant, who were in Ms. Bell's maroon Chevy Malibu, in a gravel parking lot. The two groups parked next to each other in their cars. Next to the gravel parking lot was a house, which co-defendant Goliday entered. Soon after, he came running back out of the house and both vehicles drove out of the gravel parking lot. Mr. White told Ms. Reynolds that he needed to leave her at someone's house while Mr. White "handle[d] some business." Ms. Reynolds knew "something was happening" and she had a bad feeling.

Ms. Reynolds was upset with Mr. White for leaving her and tried to persuade him not to go. Mr. White agreed to stay and co-defendant Goliday and the Defendant left in the maroon Chevy Malibu with co-defendant Goliday driving the vehicle. Mr. White attempted to call co-defendant Goliday and the Defendant on Ms. Bell's phone multiple times and eventually co-defendant Goliday returned Mr. White's calls. The group arranged to meet at Mr. Head's mother's house. Once there, the men exited their vehicles and Ms. Reynolds heard co-defendant Goliday talk about firing three or four shots and making "him" "jump out of his shoes." The group then traveled to co-defendant Goliday's mother's house in Kentucky. Once inside the house, co-defendant Goliday had a weapon visible in his hands. Mr. White eventually took the gun and put it in the glovebox of the

white Lexus then Mr. White and Ms. Reynolds left and took the gun to her parents' house.

On cross-examination, Ms. Reynolds agreed that she was not present when the victim was shot.

Based on this evidence, the jury convicted the Defendant of facilitation to commit first degree premeditated murder and conspiracy to commit first degree premeditated murder. The trial court imposed fifteen-year sentences for each conviction and ordered that the sentences be served concurrently in the Tennessee Department of Correction. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the evidence is insufficient to support his convictions. He contends that no rational trier of fact could have concluded that he knew that co-defendant Goliday intended to murder the victim or that he knowingly provided substantial assistance in the commission of the murder. Secondly, he contends that no trier of fact could have reasonably concluded that he had the requisite mental state for a conspiracy conviction. The State responds that a jury could reasonably find that, given the close relationship between the Defendant and co-defendant Goliday, the Defendant knew why co-defendant Goliday was searching for the victim and what he planned to do. The State contends that the video evidence clearly shows the two men looking for the victim together, including them both getting out of the Chevy Malibu and walking in front of the Kellogg Street residence. The State further notes that the two men are seen talking just over a minute before the victim was shot on the surveillance video. As for the conspiracy to commit first degree premeditated murder conviction, the State posits that the jury could have reasonably inferred from the evidence that the Defendant and co-defendant Goliday formed a plan to go find the victim and kill him, and that they recounted doing so when meeting up with Mr. White approximately fifteen minutes later, which is sufficient to support the conviction. We agree with the State.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn

from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d). The element of premeditation is a question of fact for the jury. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. *State v. Bland*, 958 S.W.2d 651, 660

(Tenn. 1997). In *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000), our Supreme Court delineated the following circumstances from which a jury may infer premeditation:

> Declarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

The jury may also infer premeditation from the establishment of a motive for the killing and the use of multiple weapons in succession. *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

### a. Facilitation of First Degree Premeditated Murder

A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, . . . the person knowingly furnishes substantial assistance in the commission of the felony. T.C.A. § 39-11-403(a).

The evidence presented at trial and viewed in the light most favorable to the State was that the Defendant and co-defendant Goliday were cousins and best friends. On the day of the victim's murder, the Defendant and co-defendant Goliday discussed with Mr. White and Mr. Head that the victim had stolen drugs or money. The group decided to confront the victim about the issue and, armed with a gun, went looking for him. They discussed "shooting up" the place where the victim was located. This is evidence of premeditation. Co-defendant Goliday drove and the Defendant rode in Ms. Bell's Chevy Malibu to the Kellogg Street residence, searched for and then confronted the victim there. Ms. Reynolds testified that she knew something "bad" was going to happen when the group went looking for the victim. When the group arrived at the Kellogg Street residence, video surveillance showed the Defendant and co-defendant Goliday speaking with the victim and talking to each other. Within a minute of their conversation with the victim, the victim was shot.

The Defendant and co-defendant Goliday planned to find the victim and confront him about the drugs and planned to "shoot[] up" where he was located. They drove together, armed with a weapon, to the Kellogg Street residence and shot and killed the victim and then fled together. They traveled to Kentucky, with the Defendant still driving Ms. Bell's Malibu, and met up with Mr. White. There, they gave him the murder weapon to dispose of in order to conceal their crime.

Importantly, the Defendant was present during a conversation before the shooting during which co-defendant Goliday discussed shooting the victim. He rode with co-defendant Goliday to the location where the shooting occurred, was present during the shooting, and then remained with co-defendant Goliday after the shooting while co-

defendant Goliday disposed of evidence related to the shooting. This is sufficient evidence from which the jury could conclude that the Defendant provided substantial assistance to co-defendant Goliday when he shot and killed the victim.

### b. Conspiracy to Commit First Degree Premeditated Murder

The offense of conspiracy is committed if two or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one or more of them will engage in conduct which constitutes such offense. T.C.A. § 39-12-103(a). It is also required that "an overt act in pursuance of such conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired." T.C.A. § 39-12-103(d).

The essential feature of the crime of conspiracy is the accord-the agreement to accomplish a criminal or unlawful act. *See State v. Pike*, 978 S.W.2d 904, 915 (Tenn. 1998); *State v. Hodgkinson*, 778 S.W.2d 54, 58 (Tenn. Crim. App. 1989). A formal agreement is not required, nor must it be expressed; it may, and often will be, proven by circumstantial evidence. *See Pike*, 978 S.W.2d at 915; *State v. Shropshire*, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993); *State v. Gaylor*, 862 S.W.2d 546, 553 (Tenn. Crim. App. 1992) ("[A] mutual implied understanding is sufficient, although not manifested by any formal words, or a written agreement"). "The unlawful confederation may be established by circumstantial evidence and the conduct of the parties in the execution of the criminal enterprise. Conspiracy implies concert of design and not participation in every detail of execution." *Randolph v. State*, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978).

The evidence presented and viewed in the light most favorable to the State was that the Defendant and co-defendant Goliday made a plan with two other men to confront the victim about a theft. The men discussed using a firearm and shooting up the victim's location. The Defendant, knowing the plan, drove with co-defendant Goliday to the location to confront the victim. He exited the vehicle with co-defendant Goliday, and was seen talking to the victim and co-defendant Goliday on surveillance video minutes before the shooting. A jury could reasonably conclude that, based on their close personal relationship and their acting in concert that day, the Defendant and co-defendant Goliday's conduct amounted to a concert of design and a mutual understanding that they would retaliate against the victim. Their presence during the discussion about how to handle the theft, their overt act of driving together to the Kellogg Street residence to find the victim as planned, and their mutual flight is evidence sufficient from which a jury could conclude that the Defendant entered into an agreement with co-defendant Goliday that they would find the victim and kill him. The Defendant is not entitled to relief.

### III. Conclusion

After a thorough review of the record and relevant authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE